UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MELISSA GAYE JORDAN                )
        Plaintiff,                 )
                                   )
        v.                         )   Civil No. 1:16-cv-951
                                   )
NANCY A. BERRYHILL,                )
        Defendant.                 )

## REPORT AND RECOMMENDATION

Pursuant to the Social Security Act § 205(g), 42 U.S.C. § 405(g), Melissa Gaye Jordan ("Plaintiff") seeks judicial review of the final decision of Nancy A. Berryhill ("Defendant"), the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act. On December 19, 2016, the certified Administrative Record ("R.") was filed under seal, pursuant to Local Civil Rules 5(b) and 7(C)(1). By August 3, 2017, both parties filed motions for summary judgment with briefs in support, which are now ripe for resolution.[1] On August 28, 2017, U.S. District Judge Liam O'Grady referred this matter to the undersigned U.S. Magistrate Judge.

---

1. The motions and briefs in this case include the Plaintiff's Motion for Summary Judgment (Dkt. 14) ("Pl.'s Mot. Summ. J."), the Memorandum in Support of Plaintiff's Motion for Summary Judgment (Dkt. 15) ("Pl.'s Mem. Supp."), the Defendant's Motion for Summary Judgment (Dkt. 19) ("Def.'s Mot. Summ. J."), the Memorandum in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment (Dkts. 21 & 22) ("Def.'s Mem. Supp. & Opp'n"), and Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. 23) ("Pl.'s Resp.").

For the following reasons, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Dkt. 14) be DENIED and Defendant's Motion for Summary Judgment (Dkt. 19) be GRANTED.

## I. <u>PROCEDURAL BACKGROUND</u>

Plaintiff filed the presently disputed application for SSI on November 5, 2010, alleging disabilities of bipolar disorder, high blood pressure, chronic obstructive pulmonary disease ("COPD"), and grand mal seizures with an alleged onset date of September 1, 2010. (R. at 133.)[2] Plaintiff's claims were first denied on June 27, 2011, then again on reconsideration on May 8, 2012. (<u>Id.</u> at 175-77, 191-93.) On July 9, 2012, Plaintiff filed a request for a hearing in front of an administrative law judge ("ALJ"). (<u>Id.</u> at 103, 197-98.) The hearing was held in front of ALJ Eugene Bond on February 21, 2014, during which the testimonies of Plaintiff and vocational expert ("VE") James Ryan were taken. (<u>Id.</u> at 55.) The ALJ issued his decision denying Plaintiff's claims on April 8, 2014. (<u>Id.</u> at 32-34.) Plaintiff requested review of the ALJ's decision to the Appeals Council for the Office of Disability and Adjudication and Review ("Appeals Council") on June 6, 2014. (<u>Id.</u> at 28.) The Appeals Council denied Plaintiff's request for review on September 23, 2015, making the ALJ's decision the final decision of the

---

2. The Administrative Record also provides information about Plaintiff's previous filing for disability. The previous claim was filed on April 7, 2009, denied on September 4, 2009, and then denied again on reconsideration on March 24, 2010. (R. at 111-32.)

Defendant. (Id. at 4) Plaintiff filed her Complaint (Dkt. 1) for judicial review of Defendant's decision on August 22, 2016. Defendant filed her Answer (Dkt. 8) on December 19, 2016. By August 3, 2017, Plaintiff filed her Motion for Summary Judgment (Dkt. 14) and Defendant filed her Motion for Summary Judgment (Dkt. 19). The matter is now ripe for review.

## II. STANDARD OF REVIEW

Under the Social Security Act, the Court's review of Defendant's final decision is limited to determining whether Defendant's decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance. Hays, 907 F.2d at 1456. While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

In reviewing for substantial evidence, the Court must examine the record as a whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility determinations,

3

or substitute [its] judgment for that of the Secretary." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (citing <u>Craig v. Chater</u>, 76 F.3d at 589 (4th Cir. 1996)). The correct law to be applied includes the Social Security Act, its implementing regulations, and controlling case law. <u>Coffman</u>, 829 F.2d at 517-18. Moreover, Defendant is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of a claimant. <u>Hays</u>, 907 F.2d at 1456-57. With this standard in mind, the Court next evaluates the ALJ's findings and decision.

### III. ALJ'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

An ALJ is required to employ a five-step sequential evaluation in every Social Security disability claim analysis to determine a claimant's eligibility. The Court examines this five-step process on appeal to determine whether the correct legal standards were applied in this case, and whether Defendant's resulting decision is supported by substantial evidence in the record. 20 C.F.R. §§ 404.1520 and 416.920. In accordance with the five-step sequential analysis, the ALJ made the following findings of fact and conclusions of law.

First, the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 5, 2010, the date of her application for SSI. (R. at 37.) Second, the ALJ found that Plaintiff has the following severe impairments: bipolar

disorder, COPD, hypertension, polysubstance abuse in recent remission, and low back impairment. (Id.) Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of the one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform unskilled work at the sedentary level as defined in 20 C.F.R. § 416.967(a), with the following limitations of:

- Only simple and routine tasks and only occasional interaction with supervisors, coworkers, and the public;
- Only occasional use of judgment to make simple decisions;
- Only low-stress work and no performance of production-paced work or work that involves production standards, general changes, or judgment changes;
- Only work that permits alternating between sitting and standing at-will during the workday to alleviate symptoms of pain and discomfort.

(Id. at 39.) Fifth, the ALJ found that while Plaintiff did not have any relevant past work, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Id. at 44-45.) Therefore, the ALJ determined that Plaintiff has not been under a disability, as defined in the Social Security Act, from September 1, 2010, the alleged onset date, through August 18, 2014, the date of the ALJ's decision. (Id. at 45-46.)

5

## IV. RELEVANT FACTUAL BACKGROUND

Plaintiff was 44 years old when she testified before the ALJ. (Id. at 57.) Plaintiff has a high school education and has a certificate in private investigation. (Id. at 58.) Plaintiff can read and write, but cannot do simple math. (Id.) Plaintiff's most recent employment involved work as a receptionist. (Id.) In her initial claim, Plaintiff alleged a disability onset date of September 1, 2010, with disabilities of bipolar disorder, high blood pressure, COPD, and grand mal seizures. (Id. at 133.) At the ALJ hearing, Plaintiff spoke of additional conditions, including anxiety, depression, and sleep apnea. (Id. at 59-62.)

### A. Testimony at the Hearing Before the ALJ

At the February 21, 2014, hearing before ALJ Eugene Bond, Plaintiff testified that she was receiving medication for the mental conditions of anxiety, bipolar disorder, and depression. (Id. at 60.) Plaintiff testified that because of her mental conditions she cries uncontrollably, gets very nervous, cannot focus or concentrate, has no empathy for others, and sometimes sleeps for days at a time. (Id. at 61-63, 66-67.) Plaintiff latter added that sometimes she stays awake for as long as four to five days straight. (Id. at 64.) Plaintiff testified that her mental conditions do not allow her to complete activities of daily living or to socialize. (Id. at 65.) Plaintiff also testified that her mental conditions worsen when she is not on

6

medication, and at one point while not on medication, she spent five to six months living in the woods. (Id. at 63.) However, Plaintiff stated repeatedly that the medication for her mental conditions only "takes the edge off." (Id. 60-62.) Aside from her mental conditions, Plaintiff also testified that she was receiving medication for the physical conditions of arthritis, high blood pressure, and COPD. (Id. at 62.) Plaintiff stated that she could not afford a machine to treat her sleep apnea. (Id. at 62.) Plaintiff testified that she has difficulty breathing and can only walk two to three blocks at a time. (Id. at 65.)

The ALJ received testimony from VE James Ryan at the hearing on February 21, 2014. (Id. at 68-72.) The VE stated that an individual with Plaintiff's impairments and limitations can perform unskilled, sedentary work in the national economy. (Id. at 69-71.) The VE did testify that a person with Plaintiff's background, plus the additional limitation of only being able to work three days a week, would not be capable of sustaining full-time employment. (Id. at 71-72.)

### B. Medical Evidence of Mental Impairments[3]

The medical evidence detailing Plaintiff's mental conditions includes records from the Fairfax-Falls Church

---

3. Because Plaintiff limited her arguments on appeal to issues relating to her mental impairments, the relevant medical evidence will be limited to evidence pertaining to Plaintiff's mental impairments.

Community Services Board ("CSB"), consultative examiner Dr. Louise Roy, Ph.D., consultative examiner Dr. John Kalil, Ph.D., consultative examiner Dr. Gustavo E. Rife, Psy.D., medical consultant Dev R. Chhabra, M.D., treating physician Dr. John Wilson, M.D., consultative examiner Dr. Courtnee Pelton, Psy.D., and medical consultant Dr. Farook A. Shaikh, M.D. Summaries of the findings and relevant conclusions within the medical records are provided in chronological order below.

Plaintiff began seeking mental health treatment at CSB in March 2009, before any consultative examinations. (Id. at 296-306.) During a March 2009 evaluation, CSB records noted that Plaintiff was oriented, logical, coherent, and lacked any sign of psychosis. (Id. at 298.)

On August 21, 2009, Dr. Roy examined Plaintiff during a consultative mental status examination. (Id. at 311-321.) Based upon her evaluation of Plaintiff, Dr. Roy found that Plaintiff showed the capability to conduct activities of daily living, displayed good attention and memory, and understood and followed simple and complex instructions. (Id. at 320.) Dr. Roy noted that Plaintiff was socially adept but would likely have difficulties in dealing with other people. (Id.) Dr. Roy found Plaintiff's claims of paralyzing depression to be suspect due to her ability to function and present herself relatively well. (Id. at 321.) Dr. Roy also believed Plaintiff was unlikely to

8

continue to abstain from drugs and alcohol. (Id.) Ultimately, Dr. Roy diagnosed Plaintiff with polysubstance dependence in early full remission and antisocial personality disorder. (Id.)

On September 4, 2009, Dr. Kalil conducted a psychiatric review of Plaintiff. (Id. at 113-15.) Based on his evaluation, Dr. Kalil found that Plaintiff could complete activities of daily living, had mild social functioning difficulties, and had moderate difficulties with concentration. (Id. at 115.) Ultimately, Dr. Kalil diagnosed Plaintiff with a medically determinable mental impairment that did not rise to an affective disorder. (Id.)

From July 2010 to June 2011, Plaintiff continued to seek mental health treatment at CSB and was examined by multiple health professionals throughout. (Id. at 436-55, 457-96, 498-505, 507-15, 527-50, 552-65.) During a July 2010 evaluation, CSB records noted that Plaintiff was angry and frustrated, particularly involving her interactions with others. (Id. at 546.) During an August 2010 evaluation, CSB records noted that Plaintiff's medication was helping her depression, helping her mood swings, and curbing her desire to use drugs. (Id. at 543.) In January 2011, Plaintiff sought treatment from CSB for her suicidal ideation and CSB records note that she was angry and depressed. (Id. at 534-35.) During a later January 2011 evaluation, Plaintiff was noted as calm, pleasant, and

9

cooperative with logical and coherent thoughts and fair to good insight and judgment. (Id. at 444.) During evaluations in March 2011 through June 2011, Plaintiff was still noted as calm, pleasant, and cooperative with logical and coherent thoughts and fair to good insight and judgment, but she was also noted as being sad and anxious. (Id. at 500, 509, 554, 563.)

On June 7, 2011, Dr. Rife examined Plaintiff during a consultative psychological evaluation. (Id. at 517-20.) Based on his evaluation, Dr. Rife found that Plaintiff had an unimpaired ability to perform simple and repetitive tasks, a mildly impaired ability to perform complex tasks and work regularly, a moderately impaired ability to interaction with others, peform work without interruption, and manage funds, and a markedly impaired ability to perform consistently and manage routine stressors. (Id. at 519.) Ultimately, Dr. Rife diagnosed Plaintiff with bipolar disorder, polysubstance dependence in partial remission, and post-traumatic stress disorder. (Id.)

On June 13, 2011, Dr. Chhabra examined Plaintiff during a consultative medical examination. (Id. at 522-26.) Dr. Chhabra noted that Plaintiff was awake, alert, and did not appear to be under any apparent distress. (Id. at 524-25.) While evaluating her mental impairments, Dr. Chhabra found that while Plaintiff suffered from bipolar disorder, the symptoms were under control. (Id. at 525.)

10

Plaintiff continued to seek mental health treatment from
CSB in the months following her consultative examinations by Dr.
Rife and Dr. Chhabra. (Id. at 575-93, 596-627, 681-713.) During
evaluations in July 2011 and August 2011, Plaintiff was still
noted as calm, pleasant, and cooperative with logical and
coherent thoughts and fair to good insight and judgment, but she
was also noted as being sad and anxious, yet appreciative. (Id.
at 577, 588, 596, 606, 614.) During this time, CSB records again
noted that Plaintiff's medications were effectively assisting
her in managing her anxiety. (Id.) During evaluations in January
2012, CSB records noted that Plaintiff's medications were
continuing to effectively manage Plaintiff's mental conditions,
but that Plaintiff required continued support. (Id. at 687,
711.)

From September 2012 to September 2013, Plaintiff sought
mental health treatment from Dr. Wilson, her treating physician,
on nine occasions. (Id. at 726, 758.) Dr. Wilson stated that
Plaintiff's mental health symptoms included mood disturbance,
social withdrawal or isolation, and decreased energy. (Id. at
726, 758.) Dr. Wilson also stated that Plaintiff's health was
relatively stable when on medications. (Id. at 727, 759.) After
a January 2013 examination, Dr. Wilson estimated that
Plaintiff's condition would make her unable to work about two
times a month. (Id. at 728.) Dr. Wilson changed this estimate to

11

three times a month after seeing Plaintiff in September 2013. (Id. at 760.) With regards to functional limitations from mental impairments, after a January 2013 examination, Dr. Wilson stated that Plaintiff had no restrictions on completing activities of daily living, had slight difficulties in maintaining social functioning, often had deficiencies of concentration and persistence of pace that would result in failure to complete tasks in a timely manner, and once or twice would have episodes of deterioration or decompensation in work settings. (Id. at 730.) After a September 2013 examination of Plaintiff, Dr. Wilson changed his observations on limitations to state that Plaintiff would repeatedly have episodes of deterioration or decompensation in work settings. (Id. at 762.) Dr. Wilson explained that the limitations resulted from Plaintiff's low energy, low motivation, and low tolerance of frustration. (Id. at 729-31, 761-62.)

On September 9, 2013, Dr. Pelton examined Plaintiff as during a consultative mental status evaluation. (Id. at 733-35.) Dr. Pelton observed that Plaintiff was alert, oriented, and appropriately dressed and groomed, with logical thought processes, normal speech, sufficient eye contact, normal posture, and adequate judgment and insight. (Id. at 734.) Dr. Pelton also observed that Plaintiff was frustrated and irritable, but noted no behavioral abnormalities. (Id.) Dr.

Pelton ultimately diagnosed Plaintiff with a major depressive disorder and a generalized anxiety disorder. (Id. at 734.) Dr. Pelton predicted that Plaintiff had a positive prognosis for improvement depending on her motivation for treatment. (Id. at 735.)

On September 25, 2013, Dr. Shaikh examined Plaintiff during a consultative medical examination and made note of some aspects of her mental health condition. (Id. at 739-742.) Dr. Shaikh noted that Plaintiff was alert and oriented, had normal cerebral functioning, and had a normal mental status. (Id. at 741.)

## V. ANALYSIS

Plaintiff raises three issues on appeal. First, Plaintiff argues that the ALJ did not support his determination of Plaintiff's RFC with substantial evidence. Second, Plaintiff argues that the ALJ erred by not determining Plaintiff's RFC through a function-by-function analysis. Third, Plaintiff argues that the ALJ failed to pose a properly phrased hypothetical question to the VE. Each argument is addressed in turn below.

### A. Evidential Basis for the ALJ's RFC Evaluation

Plaintiff first argues that the ALJ erred in determining Plaintiff's RFC, as substantial evidence does not support the ALJ's determination. (Pl.'s Mot. Summ. J. at 1; Pl.'s Mem. Supp. at 5.) Specifically, Plaintiff argues that the ALJ substituted his own opinion for that of the medical experts and then picked

13

and chose medical evidence to support his conclusion. (Pl.'s Mem. Supp. at 6.) Plaintiff argues that the ALJ instead should have noted the voluminous medical observations of Plaintiff's debilitating mental impairments. (Pl.'s Mem. Supp. at 5.) Plaintiff also argues that the ALJ should have assigned more weight to Dr. Wilson as Plaintiff's treating physician, particularly with regards to his opinions on Plaintiff's ability to maintain a regular work schedule. (Pl.'s Mem. Supp. at 5-6.) In opposition, Defendant argues that substantial evidence does support the ALJ's determination of Plaintiff's RFC. (Def.'s Mem. Supp. & Opp'n at 20.)

RFC is generally defined as the most that an individual is able to do despite limitations caused by his or her impairments. 20 C.F.R. §§ 404.1545, 416.945. The Social Security regulations state that

> Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

S.S.R. 96-8p. To determine RFC, "it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id. An ALJ is

required to consider all relevant evidence in the case record in making the RFC assessment. Felton-Miller v. Astrue, 459 F. App'x 226, 230-31 (4th Cir. 2011). The ALJ's assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." S.S.R. 96-8p. The final responsibility for determining a claimant's RFC is reserved to the ALJ, who must provide an adequate explanation to support the restrictions contained in the RFC assessment. 20 C.F.R. §§ 404.1545(a), 416.945(a).

Medical opinions are one type of evidence that an ALJ considers when determining a claimant's RFC. Id. § 404.1527(b). Under the Social Security regulations, certain factors are considered to determine the weight given to a medical opinion: (1) examining relationship, (2) treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) any other factors that tend to support or contradict the medical opinion. Id. § 404.1527(c)(1)-(6). Generally, opinions from treating sources are given more weight than other opinions, and if it is found that a treating source's opinion on the nature and severity of a claimant's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record," it will be given "controlling weight." Id. § 404.1527(c)(2). If a treating source's opinion is not given controlling weight, the above factors are considered, as well as the length, nature, and extent of the treatment relationship and the frequency of examinations. Id. § 404.1527(c)(2)(i)-(ii). However, an ALJ may give less weight to a treating source's opinion when there is persuasive contrary evidence. Bishop v. Comm'r of Soc. Sec., 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)). Put another way, "if a [treating] physician's opinion is not supported by clinic evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (quoting Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)).

In the instant case, the ALJ did consider the medical evidence of Plaintiff's allegedly debilitating mental impairments that caused her to cry continuously and unable to work. The ALJ considered the opinions of Dr. Roy, Dr. Pelton, and Dr. Wilson, and how each related to Plaintiff's allegations. The ALJ then utilized his determinations in assessing Plaintiff's RFC.

Upon considering Dr. Roy's opinion, the ALJ assigned it "partial weight," but specifically believed that Dr. Roy's

opinions accurately assessed Plaintiff's functional limitations. (R. at 43.) The ALJ noted that Dr. Roy stated that despite Plaintiff's mental impairments, Plaintiff "had good attention and memory, and fair problem-solving and poor abstracting reasoning skills" and "is capable of understanding and carrying out simple and complex instructions." (Id. at 40.) The ALJ noted that the evidence of record supported Dr. Roy's conclusions, and that Plaintiff was generally "capable of understanding and carrying out simple and complex instructions," but that Plaintiff's "temper would poses [sic] problems." (Id. at 41.) The ALJ assigned "less weight" to Dr. Roy's dim view of Plaintiff's credibility, because Dr. Roy believed Plaintiff was not committed to sobriety, when the record does not show that Plaintiff has relapsed or began using drugs again. (Id. at 43.) Ultimately, the ALJ summarized Dr. Roy's findings as not consistent with a finding of disability. (Id. at 43.)

The ALJ also considered Dr. Pelton's opinion and assigned it "great weight." (Id. at 43.) The ALJ noted that Dr. Pelton concluded that Plaintiff had an "intolerable mood," that Plaintiff's "affect reflected frustration and irritability," that Plaintiff's "thought process proceeded in a logical, linear, and goal directed manner," that Plaintiff's speech was normal, that Plaintiff's eye contact was sufficient, that Plaintiff had "no behavioral abnormalities," and that

17

Plaintiff's judgment and insight were adequate. (Id. at 42.) The
ALJ also noted that Dr. Pelton stated that Plaintiff "is
encouraged to pursue full or part-time employment in a job of
her interest." (Id. at 43.) Ultimately, the ALJ summarized Dr.
Pelton's findings by saying that the degree of social
functioning that Dr. Pelton determined were inconsistent with
Plaintiff's allegations of severe mental impairment. (Id.) The
ALJ also noted that Dr. Roy's functional findings were fairly
consistent with Dr. Pelton's. (Id. at 42.)

Lastly, the ALJ also considered treating physician Dr.
Wilson and assigned it "partial weight." (R. at 43.) The ALJ
noted that Dr. Wilson concluded that Plaintiff had very good or
good abilities in many work-related areas, that Plaintiff had no
limitation on carrying out activities of daily living, that
Plaintiff had a slight limitation on social functioning, and
that Plaintiff had often, but less than frequent, deficiencies
of concentration, persistence, and pace. (Id. at 41-42.) The ALJ
found these conclusions reliable, and that these aspects of Dr.
Wilson's opinion were consistent with Dr. Roy's conclusions.
(Id. at 41, 43-44.) However, the ALJ assigned "less weight" to
Dr. Wilson's conclusion that Plaintiff would be out of work two
to three times each month due to her mental impairments. (Id. at
44.) The ALJ justified giving less weight to this conclusion
because all of Plaintiff's other doctors agreed that Plaintiff

18

retained the ability to function in the workplace without such
absenteeism, despite her mental impairments. (Id. at 44.)
Therefore, the ALJ concluded that any finding that Plaintiff
cannot maintain a regular schedule is not due to her mental
impairments. (Id.)

Based on the ALJ's articulation of why he afforded varying
weights to each of the aforementioned doctors' opinions, the
Court finds that the ALJ did not err in his decisions on
Plaintiff's mental impairments. Therefore, the RFC that the ALJ
determined was based on substantial evidence. Specifically, the
ALJ analyzed each medical opinion appropriately. As previously
described, the ALJ considered the relationship of Plaintiff with
each doctor, how each doctor supported his or her opinions, and
the consistency of each doctor's opinion, alongside other
factors. Such evaluations allowed the ALJ to analyze Dr.
Wilson's medical opinions as Plaintiff's treating physician
appropriately. In accordance with 20 C.F.R. § 404.1527(c)(2),
the ALJ seemed to give "controlling weight" to Dr. Wilson's
medical opinions regarding Plaintiff's general work abilities,
capability to complete activities of daily living, social
functioning, and concentration, persistence, and pace, as the
ALJ stated that he relied upon those opinions in drafting
Plaintiff's RFC. (Id. at 43-44.) However, the ALJ gave less
weight to Dr. Wilson's opinion that Plaintiff would need to be

absent from work two to three times a month. The ALJ justified
this opinion by stating that "all of the claimant's doctors
believe that she retains the ability to function in the
workplace," and no other doctor suggested such absenteeism. (Id.
at 44.) Therefore, the ALJ properly showed that persuasive
evidence existed that was contrary to the determination that
Plaintiff would need to be absent from work two to three times
each month. This determination was in accordance with the
aforementioned Fourth Circuit precedent on giving less weight to
treating physician's opinions where persuasive contrary evidence
exists. See Bishop, 583 F. App'x at 67; Mastro, 270 F.3d at 178;
Craig, 76 F.3d at 590.

### B. The ALJ's Function-by-Function Analysis

Also with regards to the RFC determination, Plaintiff
briefly argues that the ALJ did not conduct a proper function-
by-function analysis. (Pl.'s Resp. at 2.) Specifically,
Plaintiff states that the ALJ expressed Plaintiff's RFC first
and then concluded that the limitations caused by Plaintiff's
mental impairments were consistent with that RFC. (Id.)
Plaintiff argues that the ALJ's analysis was contrary to the
analysis required by S.S.R. 96-8p, and cites the recent Fourth
Circuit case Monroe v. Colvin, which reversed an ALJ decision
that expressed a RFC before analyzing a claimant's limitations.
(Id. at 2-3.) Defendant did not address this aspect of

Plaintiff's argument.

To be proper according to the Social Security regulations, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis." S.S.R. 96-8p. Only after the function-by-function analysis "may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. An ALJ must essentially "build an accurate and logical bridge from the evidence to his conclusion." Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (quoting Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000)). By requiring a function-by-function analysis of a claimant's limitations first and then expressing the RFC, the Social Security regulations seek to avoid the danger of overlooking limitations and restrictions. See Monroe, 826 F.3d at 187-88; Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). However, failing to complete a function-by-function analysis before assessing the RFC is not per se reversible error. See Monroe, 826 F.3d at 188; Mascio, 780 F.3d at 636. Such failure is only reversible error "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Monroe, 826 F.3d at 188 (quoting Mascio, 780 F.3d at 636).

As Plaintiff alleged, the ALJ did express Plaintiff's RFC before analyzing Plaintiff's on a function-by-function basis. (R. at 39.)[4] However, the ALJ still provided a function-by-function analysis that considered Plaintiff's capacity to perform relevant functions and that analysis does not frustrate meaningful review. First, the ALJ considered the medical opinions of Dr. Roy, Dr. Felton, and Dr. Wilson, and how they applied to relevant functional limitations as provided in 20 C.F.R. §§ 404.1545 and 416.945. Upon considering Dr. Roy's opinion, the ALJ noted how Dr. Roy's conclusions related to Plaintiff's memory, attention, concentration, social functioning, and workplace functioning, and then made findings accordingly. (R. at 41, 43.) Upon considering Dr. Felton's opinion, the ALJ noted how Dr. Felton's conclusions related to Plaintiff's concentration and social functioning, and then made findings accordingly. (Id. at 42-43.) Upon considering Dr. Wilson's opinion, the ALJ noted how Dr. Wilson's conclusions related to Plaintiff's ability to complete activities of daily

---

4. While The ALJ provides his assessment of Plaintiff's RFC on page four of his decision, the RFC assessment is bolded and structured as a heading. (R. at 39.) After providing the RFC assessment, the ALJ analyzes the medical evidence on pages four through nine of his decision. (Id. at 39-43.) After the analysis, the ALJ then states his findings and refers to his previously provided RFC assessment for Plaintiff. (Id. at 43.) Therefore, it appears that the ALJ expressing Plaintiff's RFC assessment first was merely an organizational feature of his decision. Otherwise, the ALJ did provide an analysis and then come to a decision on Plaintiff's RFC. However, for the sake of addressing Plaintiff's argument, the Court will assume that the ALJ expressed Plaintiff's RFC before analyzing Plaintiff's limitation on a function-by-function basis in a way contrary to the requirements of the Social Security regulations.

living, social functioning, concentration, persistence, and pace, and deterioration and decompensation, and then made findings accordingly. (Id. at 41-44.) After coming to his conclusions on how each aforementioned medical opinion related to Plaintiff's functional capacity, the ALJ referred back to his previously stated RFC assessment. (Id. at 43.) Ultimately, the ALJ "built" the necessary "accurate and logical bridge from the evidence to his conclusion." Monroe, 826 F.3d at 189.

Furthermore, the ALJ's decision does not frustrate meaningful review. Meaningful review can be frustrated when an ALJ does not actually determine the extent of a claimant's limitation. See Monroe, 826 F.3d at 188 (failure to determine the extent that claimant "actually experienced episodes of loss of consciousness and extreme fatigue" frustrated meaningful review); Mascio, 780 F.3d at 636-37 (failure to determine claimant's ability to perform for a full workday frustrated meaningful review). The ALJ has not frustrated meaningful review with regards to Plaintiff's limitations, as he specifically outlined clear limitations in the RFC. (R. at 39.) Furthermore, Plaintiff was also clear about Plaintiff's primary limitation claim of potential absenteeism from work. The ALJ completely discounted that Plaintiff would be unable to maintain a regular work schedule and found that Plaintiff has no such limitation. (Id. at 44.) The ALJ came to that conclusion after reviewing Dr.

Wilson's opinion, which was the only opinion that noted such likely absenteeism, and determined that Dr. Wilson's opinion on absenteeism conflicted with all other medical opinions. (Id.)

## C. The ALJ's Hypothetical Questioning of the VE

Plaintiff argues that the ALJ's one hypothetical question to the VE was improper because it did not include all of Plaintiff's limitations. (Pl.'s Mot. Summ. J. at 1; Pl.'s Mem. Supp. at 7; Pl.'s Resp. at 1.) Specifically, Plaintiff argues that the hypothetical question should have included the expectation that Plaintiff would be absent from work due to her mental impairments. (Pl.'s Mem. Supp. at 7.) In opposition, Defendant argues that the ALJ's hypothetical question encompassed all limitations supported by substantial evidence. (Def.'s Mem. Supp. & Opp'n at 27.)

To determine whether a claimant can perform other work existing in significant numbers in the national economy, an ALJ can rely on the testimony of a VE. 20 C.F.R. §§ 404.1566(e), 416.966(e). When relying on the testimony of a VE, an ALJ must post hypothetical questions to a VE that accurately represent a claimant's RFC. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of a claimant's impairments will the VE's testimony be "relevant or helpful." Id.

In this case, the ALJ posed one hypothetical question to

24

the VEn:

> Assume that a hypothetical person has same age,
> education, work experience as the claimant and who has
> the ability to do sedentary work which is unskilled.
> The sit-stand option at will. Ability to understand,
> remember and carry out instructions which are for
> simple and routine tasks. Ability to interact with
> supervisors, coworkers, and general public
> occasionally. Ability to make simple decisions
> occasionally. Ability to use judgment in making work
> related decisions which are simple work related
> decisions. Ability to perform work that does not
> require satisfaction of a production pace. Ability to
> perform work at low stress by avoiding production
> standards, changes generally in judgement [sic]
> changes. Are there any jobs that such a hypothetical
> person can perform on a sustained basis and which jobs
> exist in significant numbers in the national economy?

(R. at 69-70.) As Plaintiff alleges, the hypothetical question

did not include any regular absenteeism from the workplace. The

ALJ relied on the VE's responses to the hypothetical question in

determining that Plaintiff could perform jobs existing in

significant numbers in the national economy. (Id. at 45-46.)

Despite not containing any information on regular

absenteeism, the ALJ's hypothetical question was proper and was

appropriately used in determining Plaintiff's ability to perform

existing work. The hypothetical question was proper because it

only contained limitations regarding Plaintiff's general work

abilities, capability to complete activities of daily living,

social functioning, and concentration, persistence, and pace

that were supported by substantial evidence because they were

consistent with treating physician Dr. Wilson's conclusions and

25

the overall evidence of record. As previously explained, a limitation that Plaintiff would be regularly absent from work was not supported by substantial evidence because Dr. Wilson's opinion, which was the only opinion that noted such likely absenteeism, conflicted with all other medical opinions. Therefore, the hypothetical questions represented all of Plaintiff's limitations that were supported by substantial evidence and the ALJ could consider the VE's testimony as "relevant or helpful." See Walker, 889 F.2d at 50.

Lastly, Plaintiff also briefly alleges that when Plaintiff's hearing representative attempted to pose a question to the VE, the ALJ cut the representative off and posed a different question, which amounted to a violation of her due process rights. (Pl.'s Mem. Supp. at 7.) In opposition, Defendant argues that the record does not demonstrate any violation of due process rights. (Def.'s Mem. Supp. & Opp'n at 27-28 n.6.)

The record does not support Plaintiff's view of the facts. Plaintiff's representative was given an opportunity to question the VE. (R. at 71.) The representative did not pose a question and instead reiterated Plaintiff's testimony about her mental health symptoms, including that Plaintiff slept four days a week. (Id.) The ALJ then posed the VE hypothetical questions about a person with Plaintiff's limitations that only worked 80

26

percent of his or her required worktime and about a person with Plaintiff's limitations that only worked three out of five workdays in a week. (Id. 71-72.) The second question clearly incorporated the representative's earlier statement, as a person that sleeps four days a week would only be able to work three days in a workweek at most. The VE then answered the questions. (Id.) The ALJ then said the representative's name, and the representative responded, "Thank you, your honor." (Id. at 72.) The ALJ then asked if the representative would be submitting any additional materials, and the representative responded, "No, your honor." (Id.) The ALJ then allowed the representative to provide a closing argument. (Id.) At no point does the record reflect that Plaintiff's representative was cut off or unable to advocate for Plaintiff at the ALJ hearing. Therefore, Plaintiff's accusation that her due process rights were violated is unsupported by the record and without merit.

## VI. RECOMMENDATION

For the reasons set forth, the undersigned Magistrate Judge finds that the ALJ's decision is supported by substantial evidence and does not contain legal error.  Therefore, the undersigned recommends that Plaintiff's Motion for Summary Judgment (Dkt. 14) be DENIED and Defendant's Motion for Summary Judgment (Dkt. 19) be GRANTED.

## VII. <u>NOTICE</u>

The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service.  Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

The Clerk is directed to send a copy of this Report and Recommendation to all counsel of record.


/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

November 3, 2017
Alexandria, Virginia